IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

DEBORAH K. JENNINGS,   )
           )
   Plaintiff,    )
           )
vs.          )  No.: _____
           )     JURY DEMANDED
THE UNIVERSITY OF TENNESSEE, )
and Dave Hart      )
           )
   Defendants.   )

---

## COMPLAINT

---

COMES now the Plaintiff, who sues the Defendants, and for cause of action would show unto this Honorable Court as follows:

### TABLE OF CONTENTS

II.  The Parties ……………………………………………………………………… 2

III. Jurisdiction, Venue, and Applicable Statutes………………………….............. 2-3

IV. Historical Background: University of Tennessee, Women's Athletics, Title IX,
   Joan Cronan, Coach Pat Summitt and Her Legacy, and the Lady Vols………….. 3-8

V.  The University of Tennessee's Honorable Beliefs and Traditions
   and Its Legal Obligations……………………………………………………9-10

VI. The Consolidation of the Women's and Men's Athletic Departments,
   Culture of Intimidation, Dave Hart's Lay-Offs, and the Adverse
   Impact on Female Employees…………………………………………… 10-18

VII. Debby Jennings' Career and Acts of Discrimination, Retaliation,
   and Hostile Environment During the Consolidation Process ……………………… 18-34

VIII. Debby Jennings' Forced Retirement, Confiscation of Her Computer, and Her
   Few Remaining Duties Given to a Younger Male………………………… 34-36

1

IX.    Post Termination Retaliation and Request for UT-K to Preserve
        Evidence..................................................................................... 36-38

X.     Mr. Hart's Background and Prior Acts of Discrimination............................. 38

XI.    Illegal Discrimination and Retaliation Statutory Violations and Damages............ 38-40

XII.   Prayer for Relief................................................................................... 40-41

## II. THE PARTIES

1.     Plaintiff, Deborah K. Jennings, is a citizen and resident of Knoxville, Knox County, Tennessee, and she is the former Associate Athletic Director for Media Relations at the University of Tennessee-Knoxville, and was a 1977 graduate of UT-K was a B.S. Degree in Communications and completed a number of hours toward her M.S. Degree.

2.     Defendant, University of Tennessee-Knoxville (hereinafter "UT-K"), is a land grant university established and authorized under the laws of the State of Tennessee, which provides undergraduate and graduate educational programs at various campuses located in the State of Tennessee, including, but not limited to, the campus located in Knoxville, Tennessee.  The Defendant may be served through Catherine Mizell, Office of General Counsel, 719 Andy Holt Tower, Knoxville, Tennessee 37996-0170.

3.     Defendant, Dave Hart, is the Athletic Director of UT-K.

## III.  JURISDICTION, VENUE, AND APPLICABLE STATUTES

4.     Jurisdiction is founded upon Federal Question, 28 U.S.C. § 1331, 29 U.S.C. § 206, 20 U.S.C. §§ 1681(a), 42 U.S.C. § 2000(e)-5(F), and 42 U.S.C. § 12101, *et. seq.*, and the doctrine of Supplemental Jurisdiction, 28 U.S.C. §§ 1367.  Venue is proper under the code provisions cited herein and 28 U.S.C. § 1391(b) and (c).

5.     The Defendant, UT-K, employs more than five hundred and one (501) employees.

2

6.      At all times stated herein, Defendant, UT-K, was, and currently is, an employer subject to the provisions of The Equal Pay Act of 1963, 29 U.S.C. § 206(d).

7.      At all times stated herein, Defendant, UT-K, was, and currently is, an employer subject to the provisions of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

8.      At all times stated herein, Defendant, UT-K, was, and currently is, an employer subject to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*

9.      At all times stated herein, Defendant, UT-K, was and currently is, an employer subject to the provision of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

10.     At all times stated herein, Defendant, UT-K, was and currently is an employer subject to the provisions of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.*

## IV.   HISTORICAL BACKGROUND:  UNIVERSITY OF TENNESSEE WOMEN'S ATHLETICS, TITLE IX, COACH PAT SUMMITT AND HER LEGACY, AND THE LADY VOLS

11.     UT-K is well-respected institution of higher education that is rich in tradition and history, and is held in the highest esteem by all that love her, including Plaintiff.

12.     UT-K is one of the oldest public Universities in the United States.

13.     UT-K originally opened in 1794, two (2) years before Tennessee became a State, under the name Blount College.

14.     In 1807, the University's name was changed to East Tennessee College.

15.     The University closed for approximately ten (10) years in 1809, and reopened in 1820.

16.     The University's name was changed again in 1840 to East Tennessee University.

17.     The University closed again for several years during the Civil War and its buildings were used as a hospital for Confederate troops and were later occupied by U.S. troops and classes were resumed in 1866.

3

18.     In about 1869, the Tennessee State Legislature designated UT-K as the state's federal land-grant institution.

19.     In 1879, the Tennessee State Legislature changed the school's name to its present name: The University of Tennessee.

20.     UT-K instituted men's intramural baseball teams in the 1870's, and had its first football team in 1891.

21.     The UT-K's Band, the Pride of the Southland, was formed in 1869, and played at its first football game in 1901.

22.     From 1794 through 1892, UT-K allowed men only.

23.     In 1893, the first female students were admitted to UT-K.

24.     As of the date of the filing of this Complaint, the majority of students currently enrolled at UT-K are women.

25.     The women's athletic program at UT-K first began in 1899 with sports such as golf, tennis and rowing leading the way under the direction of Ms. Anne Gibson of the Women's Physical Training Department at UT-K.

26.     The women's basketball team at UT-K played its first intercollegiate game in 1903. Consistent with the Volunteer spirit, the women's basketball team at UT-K elected to play by men's rules, and the women's basketball team was in existence six (6) years before the formation of the intercollegiate men's basketball team at UT-K.

27.     On March 20, 1920, the first "gender equity" meeting was held at UT-K. The female student-athletes wanted "fuller recognition for their athletic work," and sought increased funding from the university's Athletic Council. Additionally, they sought permission from the Administrative Council for off-campus travel similar to the men's varsity travel. The Knoxville Journal and Tribune reported

4

that the UT women delivered their resolutions at a meeting attended by women's basketball coach Mary Ayres (daughter of the late UT-K President W. Brown Ayres for whom Ayres Hall was named), Dean of Women Students, Caroline Carpenter, and Captain John R. Bender, professor in charge of the (men's) athletic department. As a result of that meeting, the UT-K female student-athletes earned the right to travel out-of-state.

28.    On August 18, 1920, courageous legislators from the State of Tennessee voted to ratify the 19th Amendment to the U.S. Constitution giving women the right to vote. Tennessee's ratification was the deciding vote allowing the 19th Amendment to become the law of the land.

29.    In 1926, UT-K's Athletic Department committee, under Dean Nathan Dougherty's leadership, decided it was in the "best interest" of the female students to discontinue the women's basketball program at UT-K.

30.    Women's basketball was picked up again at UT-K in 1960. Thereafter, Coach Joan Cronan went 8-10 over two seasons before being replaced by Margaret Hutson, who coached for four years with a 60-18 record.

31.    In 1961, African American undergraduates were admitted to UT-K for the first time and in 1967, UT-K signed its first African American athlete.

32.    On June 23, 1972, Title IX was signed into law by President Richard M. Nixon. Title IX's intent wasn't to promote women's sports, but to end discrimination based on gender in federally funded education venues.

33.    The positive impact of Title IX on women's sports has been significant. According to one study in 1972, about 290,000 girls played high school sports, and by 2011, more than three (3) million girls played high school sports.

34.     After Title IX became law, there was some resistance amongst the main stream athletic leadership at UT-K to accept the mandates of Title IX and, throughout her career, the Plaintiff was an unwavering advocate for the mandates of Title IX and gender equity.

35.     In 1974, Pat Head was named the new coach of UT-K's Lady Vols basketball team. Coach Head had previously played women's basketball for the UT-Martin Pacers (now known as the Skyhawks), and had just graduated.

36.     In 1976, the Women's Athletic Department at UT-K was officially recognized and was funded by UT-K.

37.     Coach Pat Head Summitt coached the Lady Vols basketball team from 1974 through the 2011-2012 school year for a total of 38 years, and compiled an unmatched record of 1,098 wins and just 208 losses. During Coach Summitt's career, from 1977 forward, the Plaintiff, Debby Jennings, was with Coach Summitt every step of the way, and Debby Jennings was admittedly loyal to Coach Summitt.

38.     Joan Cronan was hired as UT-K Women's Athletic Director in 1983 and under her most recent contract was going to serve in that capacity through June 2012. Joan Cronan was asked by UT-K Chancellor, Jimmy Cheek, to serve as Interim Vice Chancellor/Director of Athletics beginning in June of 2011.

39.     Joan Cronan was the highest ranking woman in the UT-K Athletic Department since 1983 and a nationally recognized administrator for almost four decades. Under her leadership, Joan Cronan assembled a talented staff of dedicated professionals to run the Women's Athletic Department and she fostered an atmosphere of openness and inclusion of both men and women. She established an athletic department where passionate and hardworking employees were encouraged to be proactive in problem solving and not reactive as they fulfilled their mission of providing the best possible experience for student athletes consistent with the  history and rich traditions of UT-K while bestowing honor upon

6

their beloved institution. Under Joan Cronan's leadership, employees were encouraged to speak their minds with <u>no</u> fear of retaliation and employees were expected to bring up any issues that, if left unaddressed, could adversely affect or reflect poorly on UT-K's Women's Athletic program <u>or</u> on the University of Tennessee. <u>During Joan Cronan's leadership, the UT-K's Women's Athletic program achieved unparalleled success</u>.

40. <u>Under Coach Pat Summitt, the Tennessee Lady Volunteers basketball team won eight NCAA Division I titles (1987, 1989, 1991, 1996, 1997, 1998, 2007, 2008), the most in women's college basketball history. Coach Pat Summitt became the all-time winningest basketball coach in NCAA history.</u> Coach Summitt's 1,000[th] victory occurred on February 5, 2009. <u>Coach Summitt maintained a 100 percent graduation rate for all players who finished their career at UT-K.</u>

41. <u>The combined impact of Title IX, Joan Cronan's suberb leadership, and Coach Pat Summitt's character, personality, and success at UT-K on women's sports has been tremendously positive.</u> Pat Summitt and Joan Cronan refused to accept mediocrity, and throughout their careers they accepted nothing less than excellence, both in terms of wins and losses, in terms of running clean programs, and in terms of developing the student athlete to their maximum potential ultimately leading to their graduation from UT-K. By 2012, UT-K had approximately 200 female student athletes participating on 11 teams, and <u>the Lady Vols name became a well-respected and nationally-recognized symbol of high character, scholastic achievement, and athletic excellence.</u> Joan Cronan and Pat Summitt embody the spirit and traditions of UT-K going back to 1794.

42. In her role as the Media Relations Director of the Women's Athletic Department, the Plaintiff worked with the state, local and national media to chronicle the news of every Coach Summitt and Lady Vol achievement from 1977 forward.

7

43.    In the summer of 2011, Coach Summitt was diagnosed with early onset dementia and true to her character, she decided to go public with this sad news. The Plaintiff was entrusted by the UT-K hierarchy, Chancellor Dr. Jimmy Cheek and Interim Vice Chancellor/Director of Athletics, Joan Cronan, to conceptualize, prepare and initiate all facets of the press release announcement of Coach Pat Summitt's diagnosis of early onset dementia. The Plaintiff was also entrusted with handling the avalanche of requests by the world media who immediately reacted to the biggest sports story ever to come out of the University of Tennessee.

44.    In March of 2012, UT-K Athletic Director, Dave Hart, had a meeting with Coach Summitt as hereinafter described, and on April 18, 2012, Coach Pat Summitt stepped down as Head Coach of the Lady Vols after signing an agreement with UT-K where she would be Head Coach Emeritus for a year through April 30, 2013, and Holly Warlick replaced her. <u>Debby Jennings was forced to retire shortly thereafter.</u>

45.    It's almost impossible to quantify what Pat Summitt's legacy has meant to the world of collegiate athletics as a trailblazer advocating for the growth and the acceptance of female student athletes, not just basketball players, since the dawn of Title IX. Some say she "transcended her sport," others compared her to a female version of James Naismith, or men's basketball coaching legend, John Wooden. Summitt built a program by demanding excellence and teaching life skills and life lessons to all of those around her and through her example of hard work, dedication, and by never compromising to take a shortcut. Her model of success was what every other program aspired to be and she did it with her philosophy: "You win in life surrounded by good people." "I know what Pat stands for: <u>excellence, strength, honesty and courage,</u>" former UT-K Athletic Director, Joan Cronan, told the *Washington Post* in 2011.

## V. THE UNIVERSITY OF TENNESSEE'S HONORABLE BELIEFS AND TRADITIONS, AND ITS LEGAL OBLIGATIONS

46.     The leadership of the UT-K athletic department, even the top leadership, should follow all laws prohibiting discrimination and/or retaliation and if they don't, they should be disciplined or fired.

47.     UT-K's employees, even athletic department employees, should be encouraged to oppose and/or confront illegal and discriminatory behavior in the workplace.

48.     Employees of UT-K, even athletic department employees, should not be punished or considered disloyal merely because they challenge illegal behavior or discrimination in the workplace.

49.     If one or more supervisory employees in the athletic department at UT-K, even members of the top level leadership, discriminate against female employees, their behavior should not be condoned or covered up by UT-K.

50.     Female employees in the UT-K Athletic Department have the same rights men do when it comes to earning a living, and they should receive the same compensation as male employees for equal work.

51.     Older employees in the UT-K Athletic Department have the same rights as younger employees when it comes to earning a living.

52.     No UT-K employee is above the laws that prohibit age, sex, and race discrimination just because they hold a position of leadership.

53.     UT-K supervisors, even high level supervisors, should never threaten employees and/or use intimidation tactics in order to keep the employees from telling the truth during a legal proceeding.

54.     If UT-K supervisors use intimidation and/or threat tactics in order to try to keep employees from telling the truth during a legal proceeding, they should be disciplined or fired.

9

55.     If a person in a leadership position in the UT-K Athletic Department, discriminates or retaliates against an Athletic Department employee, (even a lower level employee), they are in violation of the ideals and values and policies of UT-K, and such action should not be tolerated.

56.     A responsible institution such as UT-K should obey all laws that prohibit discrimination in the work place, and it should follow the mandates of Title IX.

57.     UT-K believes that female employees and male employees should be treated equally and gender discrimination should not be tolerated.

58.     UT-K believes that older employees should be treated equally with younger employees and age discrimination should not be tolerated.

59.     The Athletic Department at UT-K is not exempt from the laws prohibiting sex, race and age discrimination.

60.     The laws prohibiting sex, race, and age discrimination apply to the employees of the athletic department the same as they apply to other employees at UT-K.

## VI. THE CONSOLIDATION OF THE WOMEN'S AND MEN'S ATHLETIC DEPARTMENTS, CULTURE OF INTIMIDATION, DAVE HART'S LAY-OFFS, AND THE ADVERSE IMPACT ON FEMALE EMPLOYEES

61.     The Plaintiff enjoyed a very successful career at UT-K and by 2009, she was responsible for the Media Relations oversight of 11 Lady Vols sports; she was responsible for a budget over half a million dollars; she was responsible for the direct supervision of the media efforts for Lady Vols basketball; and she was responsible for the supervision of three (3) full-time employees, four (4) graduate assistants, and numerous practicum and student employees.

10

62.     During the consolidation process of the men's and women's athletic departments, Plaintiff's career, and the careers of other female employees of the athletic department, took a turn for the worse under the leadership of Chris Fuller, Jimmy Stanton, and Dave Hart

63.     During the consolidation process, the Plaintiff was marginalized and ostracized, she was denied employment opportunities due to her gender, and/or age (first when Jimmy Stanton (38) was hired, and later when Jason Yellin (38) was hired), and she was gradually stripped of her duties and responsibilities.

64.     By the time she was forced to retire on May 15, 2012, as hereinafter stated, the Plaintiff had zero (0) direct reports, she had no budgetary responsibilities, and she had only limited media duties connected to Lady Vols basketball.  Immediately, after her forced retirement, her few remaining duties were assigned to a male.

65.     During the consolidation process, younger males were hired by the UT-K athletic department (in non-coaching roles) and were placed in positions of leadership, including Jimmy Stanton (age 38), Jason Yellin (age 38), Jon Gilbert (age 44), and Mike Ward (age 35), and during the same time period, no women were hired and placed in comparable positions of leadership.

66.     Although Joan Cronan was under contract to serve as Women's Athletic Director through June 30, 2012, Dave Hart assumed total control of both departments on September 5, 2011, thereby marginalizing Joan Cronan almost immediately despite her contract and her record of unparalleled success as an Athletic Administrator.

67.     Under their leadership and during the consolidation process, Mr. Hart, Mr. Fuller and Mr. Stanton fostered a culture of intimidation and hostility in the Athletic Department where employees questioning them or their ideas in any manner were regarded as "disloyal" or "divisive" even if they were questioning potential illegal actions, such as discrimination and retaliation.  For example, even

11

after Plaintiff's forced retirement, Mr. Hart has given the veiled example of the Plaintiff's and Bud Ford's terminations as examples of what can happen to other Athletic Department employees if they question the Athletic Department's leadership in any manner. <u>The Plaintiff respectfully submits that such a culture does discredit to our beloved institution and those that foster it should be trained or retrained if possible, in the core values and in the traditions of those great men and women who came before them at UT-K.</u>

68.     As the consolidation of the men's and women's athletic departments continued at UT-K, Dave Hart, on Friday, April 13, 2012, implemented layoffs in the Athletic Department and fifteen (15) employees were selected to be laid off.   Of the 15 (fifteen) employees laid off, <u>twelve (12), or 80%, were female, and three (3), or 20% were male.</u>

69.     Mr. Hart made the decision on who would be laid off and who would be retained in the Athletic Department.

(See U.T. April 16, 2012 Press Release: Exh. 1, and Hart's 4/11/12 Memorandum to Jimmy G. Cheek: Exh. 2).

70.



DAVE HART'S APRIL 13, 2012 LAY OFFS
AT THE ATHLETIC DEPARTMENT AT UT-K

80%
(12)

20%
(3)

MALES LAID OFF    FEMALES LAID OFF

[See Exh. 1 and 2]

71.    After Dave Hart's layoffs of April 13, 2012, of the eight (8) Executive Staff positions in

UT-K's Athletic Department, seven (7), (or 87.5%) are males, and only one (1), (or 12.5%) (Donna

Thomas) is a female.  (See Exhibits 1 and 2)

72.



**EXECUTIVE STAFF IN ATHLETIC DEPARTMENT**
**AT UT-K AFTER DAVE HART'S APRIL 13, 2012 LAYOFFS**

[Source – See Exhibits 1 and 2]

73.     After Mr. Hart's layoffs, the persons in Executive Staff positions in the UT-K Athletic

Department were as follows:

**Executive Staff , After Layoffs:**

| | |
|---|---|
| 1. Dave Hart | Vice Chancellor/Director of Athletics |
| 2. Jon Gilbert | Executive Senior Associate Athletic Director (also men's basketball administrator) |
| 3. David Blackburn | Senior Associate AD for Administration (also football sport administrator) |
| 4. Chris Fuller | Senior Associate AD for Development and External Relations |
| 5. Bill Myers | Senior Associate AD for Business Operations/CFO |
| 6. Donna Thomas | Senior Associate/Senior Woman Administrator (also women's basketball and M/W Track & Field sport administrator) |
| 7. Mike Ward | Senior Associate AD for Administration and Sports Programs (also softball and women's soccer sport administrator) |
| 8. Jimmy Stanton | Associate AD, Communications |

14

74.     NCAA By-Laws expect member Athletic Departments to have at least one female in the executive staff management level positions.

75.     The UT-K Athletic Department has met the bare minimum of NCAA By-Law requirements by having one female in an Executive Staff position.

76.     After Mr. Hart's April 13, 2012 layoffs, <u>of the fifteen (15) members of the Senior Administrative Staff in the UT-K Athletic Department,</u> (thirteen (13), (or 86.7%) are males, and just <u>two (2),</u> (or 13.3%) <u>are females</u> (Angie Boyd-Keck and Dara Worrell). (See Exhibits 1 and 2)

77.



78.     After Dave Hart's lay-offs April 13, 2012, the Senior Administrative Staff of the UT-K Athletic Department consisted of the following:

**Senior Administrative Staff , After Lay-offs:**

1. Ron McKeefery — Director of Strength and conditioning
2. Todd Dooley — Assoc. AD for Compliance
3. Jason McVeigh — Director of Sports medicine
4. Tyler Johnson — Assoc. AD for Business/Internal affairs
5. Brad Pendergrass — Director of Football operations
6. Kevin Zurcher — Asst. AD for Facilities
7. Joe Arnone — Assoc. AD for Tickets
8. Greg Hulen — Assoc. AD for Development
9. Jason Yellin — Asst. AD Media Relations
10. David Elliott — Asst. AD for Event management
11. Doug Kose — Asst. AD for Sales and Marketing
12. Thomas Moats — Director of IT Services
13. Academics — Position is open

**Sport Administrators**

14. Carmen Tegano — Assoc. AD/Baseball administrator
15. Angie Boyd-Keck — Assoc. AD, Business Office and M/W Golf, Volleyball and Rowing sport administrator
16. Dara Worrell — Assoc. AD/Housing/dining and M/W Swimming and M/W Tennis sport administrator

[See Exhibit 1 and 2]

79.     As of the date of the filing of this Complaint, of the twenty-three (23) Executive Staff and Senior Administrative Staff level positions in the UT-K Athletic Department, twenty (20), (or 87%) are males, and just three (3), or (13%) are females, and zero (0) are African American.

16

80.



**EXECUTIVE STAFF AND SENIOR ADMINISTRATIVE STAFF IN THE UT-K ATHLETIC DEPARTMENT**
AFTER HART'S APRIL 13, 2012 LAYOFFS AT UT-K

MALES 87% 20

FEMALES 13% 3

AFRICAN AMERICANS (0)

[See Exhibits 1 and 2]

81.     As of the date of the filing of this Complaint, UT-K's Athletic Department has been unable to find a single qualified African American for an executive staff or senior administrative staff level position.

82.     During the reorganization process in 2012, Women's Associate Athletics Director for Sports Medicine, Jenny Moshak and Assistant Athletics Director for Strength and Conditioning, Heather Mason, who had been frequently published, nationally recognized, and honored by their professional

17

organizations, were combined into men's athletics and their male counterparts on the men's side became their supervisors.

83.     Jenny Moshak and Heather Mason were effectively demoted during the "reorganization"/"consolidation." Their demotions occurred after they had filed EEOC complaints against UT-K.

84.     The consolidation of the men and women's athletic department at UT-K has had an adverse impact on the female employees, including the Plaintiff.

## VII.   DEBBY JENNINGS' CAREER AND ACTS OF DISCRIMINATION, RETALIATION, AND HOSTILE ENVIRONMENT DURING CONSOLITATION PROCESS

85.     Following her graduation from UT-K in June 1977, the Plaintiff was hired by UT-K on August 1, 1977, at the age of 22 as a Graduate Assistant Sports Information Director in the Women's Intercollegiate Athletic Department.

86.     In her position as Graduate Assistant Sports Information Director, the Plaintiff was charged with creating and implementing the first UT-K Women's Athletic Department Media Relations Office and she successfully fulfilled this job assignment which resulted in her employment on a fulltime basis in August 1978 as the first Lady Vol Sports Information Director.

87.     The Plaintiff was promoted to UT-K Assistant Athletic Director for Media Relations in 1988.

88.     The Plaintiff successfully ran the Women's Athletic Department's Media Relations Office from 1977 until 2009 when the men and women's Media Relations Departments were consolidated.

89.     The Plaintiff was appointed as an Adjunct Professor, University of Tennessee College of Education in 1991 and she retained that appointment until she was forced to retire on May 15, 2012.

18

90.     The Plaintiff was promoted to the position of UT-K Associate Athletic Director for Media Relations in July 1998.

91.     The Plaintiff was continuously employed by UT-K until May 15, 2012.

92.     During Plaintiff's employment with the Defendant, she was a loyal hard working employee of UT-K, she always gave 110% and she was a team player always striving to do what was best for her beloved institution.

93.     During Plaintiff's employment with the Defendant, she received numerous raises.

94.     At the time of the Plaintiff's termination of her employment, she was 57 years old.

95.     During her employment with the Defendant, she did not receive any disciplinary write-ups.

96.     During Plaintiff's employment, she received numerous compliments, and numerous local, state and national awards.

97.     During her employment with the Defendant, the Plaintiff was:

- National Publicity and Promotions Director of the 1978 AIAW National Track & Field Championships, Knoxville, Tenn.

- Appointed Chief Press Officer, USA Basketball, 1979 Pan American Games Women's Basketball Trials, Knoxville, Tenn.

- Appointed as the first female media liaison coordinator by the United States Olympic Committee for the 1979 National Sports Festival (M/W basketball, field hockey, M/W volleyball), Colorado Springs, Colo.

- Publicity and Promotions Director of the 1979 USA vs. USSR Women's Basketball All-Star Game in Knoxville, Tenn.

19

- Co-Publicity Director of The Athletics Congress 1980 Junior National Track & Field Championships, Knoxville, Tenn.

- Appointed as a press services officer by the United States Olympic Committee for the 1981 National Sports Festival (media liaison for women's basketball), Syracuse, N.Y.

- Publicity and Promotions Director at the 1982 United States Junior Olympic Volleyball Championships, Knoxville, Tenn.

- Appointed as a press services officer by the United States Olympic Committee for the 1982 National Sports Festival (basketball, diving and track & field), Indianapolis, Ind.

- Appointed Chief Press Officer, USA Basketball, 1983 Pan American Games Women's Basketball Trials, Colorado Springs, Colo.

- Appointed as a press services liaison officer by the United States Olympic Committee for the 1983 World University Games (basketball, M/W diving and volleyball), Edmonton, Alberta, Canada.

- Appointed Chief Press Officer, USA Basketball, 1984 United States Olympic Games Team Women's Basketball Trials, Colorado Springs, Colo.

- Appointed to the United States delegation to the Games of the XXIII Olympiad as the women's basketball press services liaison officer by the United States Olympic Committee for the 1984 Los Angeles Olympic Games (women's basketball), Los Angeles, Calif.

- Appointed as a press services liaison officer by the United States Olympic Committee for the 1985 United States Olympic Festival (basketball, equestrian), Baton Rouge, La.

- Appointed as the men's and women's basketball press services liaison officer by the United States Olympic Committee for the 1986 United States Olympic Festival, Houston, Texas.

- Appointed as a press services liaison officer by the United States Olympic Committee for the 1987 Pan American Games (M/W diving and team handball), Indianapolis, Ind.

- Appointed as the chief press attaché by the United States Olympic Committee for the USA delegation to the 1989 Universidad Games (basketball, fencing, rowing and track & field), Duisburg, Germany.

- The Media Relations Director of the 1990 NCAA Women's Final Four Basketball Championships, Knoxville, Tenn.

- Served as the Co-National Media Relations Director of the 1995 NCAA Men's and Women's Track & Field Championships, Knoxville, Tenn.

- Appointed as a media liaison press attaché by the United States Olympic Committee to coordinate USA athlete post-competition interviews at the Olympic Track & Field Stadium, Games of the XXVI Olympiad in Atlanta, Ga., 1996.

- Elected as the first female president of the Southeastern Conference Sports Information Directors for a two-year term, 2000-02.

98.    During her employment, the Plaintiff served as editor for hundreds of award-winning Lady Vol Media Guides as well as authoring or co-authoring the following books:

- Co-authored BASKETBALL, a textbook for the W.C. Brown Company, with Coach Pat Head Summitt, 1991.

- Co-authored LADY MAGIC: The Autobiography of Nancy Lieberman-Cline for Sagamore Publishing with Nancy Lieberman-Cline in 1992.

21

- Co-authored BASKETBALL: Fundamentals and Team Play, a textbook for Times-Mirror with Coach Pat Head Summitt, 1996.

- Authored "The University of Tennessee Basketball Vault: The History of Lady Vols Basketball" for Whitman Publishing, LLC, 2008.

99.    During her employment, the Plaintiff received the following **AWARDS**:

- Recipient of the 1991 Recognition of Patriotic Service by the Tennessee Army National Guard awarded to a citizen who has demonstrated exceptionally dedicated performance and voluntary outstanding service and support, Ft. Stewart, Ga.

- Named the first collegiate media relations director to receive the Mel Greenberg Award for lifelong contributions to women's basketball presented by the Women's Basketball Coaches Association in 1995.

- Only the third female to be inducted into the College Sports Information Directors of America (CoSIDA) Hall of Fame, Rochester, N.Y., 2002.

- Knoxville (Tenn.) Mayor Victor Ashe proclaimed it "Debby Jennings Day" on Nov. 26, 2002, and that night she was honored in a ceremony for 25 years of service at the Lady Vol basketball game.

- Inducted as a member of the College Sports Information Directors of America Quarter Century of Service Club, 2003.

- Just the second female to be presented the Arch Ward Memorial Award by the College Sports Information Directors of America for "inspiring excellence in, and bringing dignity to, our profession through her relationships with press, radio and television and her colleagues," Tampa, Fla., 2008.

- Inducted into UT-K Athletics Lettermen/Women's Club into their membership as an "Honorary Letterman" in 2008.

- Inducted into the Greater Knoxville Sports Hall of Fame, Knoxville, Tenn., 2009.

- Inducted into the 2010 Tennessee Sports Writers Association Hall of Fame, Lebanon, Tenn.

- Presented the Trailblazer Award by the College Sports Information Directors of America for "pioneering efforts as a mentor and professional peer to foster, advance and sustain high levels of ethnic and gender diversity within CoSIDA," Marco Island, Fla., 2011.

100.   At the time of Plaintiff's termination, Mr. Stanton reported to Executive Senior Associate Athletic Director Jon Gilbert (who was a recent hire and who recently had taken over for Senior Associate Athletic Director for Development and External Affairs, Chris Fuller, in the new reporting structure).

101.   In or about 2009, UT-K began taking more aggressive steps to consolidate the Women's Athletic Department and the Men's Athletic Department to mirror the other NCAA D-1 programs with consolidated Athletic Departments.

102.   The Media Relations consolidation was overseen by Chris Fuller, Senior Associate Athletic Director. Under the consolidation, it quickly became apparent to Plaintiff that input from her, and from other women, especially women from the Women's Athletics Department, was unwelcome or not valued. Instead, their input was usually resented and dismissed; and Plaintiff was shunned for stating her opinions, or for questioning the male leaders or their ideas, or for advocating Title IX equity issues, or for opposing gender discrimination.

103.    During the consolidation process, it became obvious to the Plaintiff that the leadership attitude of the Men's Athletic Department, especially Chris Fuller, was to run it like a "good 'ol boys club" and they did not want women in leadership positions.

104.    During the consolidation process, there were several instances where female athletes, female coaches, or female employees, were not being treated equal to male athletes, male coaches or male employees. Plaintiff openly discussed these instances and tried to change or correct them, and she tried to reach equitable compromises, but her actions were resented. For example, Plaintiff opposed actions that decreased media coverage for female student athletes, or where their events weren't getting adequate media coverage. Plaintiff also advocated for renovations to Lady Vols Basketball locker room after seeing renovation after renovation of the men's basketball locker room each time the Vols had a head coaching change with four new men's head basketball coaches since 1997 (Jerry Greene 1997, Buzz Peterson 2001, Bruce Pearl in 2005 and Cuonzo Martin in 2011). The eight-time NCAA Champion Lady Vol basketball team locker room only enjoyed funding for only two significant facelifts in 1995 and 1998 – and none to the level of what men's basketball has experienced in the last 15 years. Also, the female student-athlete logo "Lady Vols" was being diminished and pushed aside by the male leadership and was being replaced by the male student-athlete's "Power T" logo. The Plaintiff also questioned a  situation where male athletes were given special treatment that female athletes did not receive. Plaintiff questioned whether this was a possible NCAA violation or if not, then the female athletes were not being treated equally which could violate Title IX. The Plaintiff tried to rectify these issues to no avail. Instead, Plaintiff was shunned and retaliated against for voicing her concerns.

105.    In 2010, there was an opening for the position of Associate Athletic Director for Communications.

106.     Plaintiff was interested in the position of Associate Athletic Director for Communications. She was qualified for the position and the Plaintiff expressed interest in the position.

107.     During a discussion with the search committee about the position, a senior associate athletic director stated that the Plaintiff should apply for the position. Plaintiff's supervisor, Chris Fuller, stated Plaintiff should _not_ apply for the job because UT-K's head football Coach, Derek Dooley, did not want to work with a female. The Plaintiff did not know if this was Coach Dooley's requirement, or if it was Chris Fuller's, but the requirement clearly constituted sex discrimination and was wrong because if Plaintiff was qualified for the position, she should not have been eliminated from consideration because she is female.

108.     Chris Fuller strongly recommended four male candidates who were thereafter interviewed for that position.

109.     The final four candidates for the position of Associate Athletic Director for Communications were males.

110.     Ultimately, Chris Fuller made the decision to hire Jimmy Stanton, a male, for the position.

111.     On August 20, 2010, Jimmy Stanton (age 38) was hired as Associate Athletic Director for Communications.

112.     Jimmy Stanton began his new job as Associate Athletic Director for Communications towards the end of August 2010, and at that time, Bud Ford and Plaintiff began to report directly to Mr. Stanton and Mr. Stanton began to report to their former supervisor, Chris Fuller.

113.     On information and belief, Mr. Stanton met almost immediately with Bud Ford (who was also an Associate Athletic Director like the Plaintiff), and Mr. Stanton met with him almost daily thereafter.

114.    Even though she made herself available, Mr. Stanton didn't meet with the Plaintiff until September 27, 2010.

115.    During Plaintiff's meeting with Mr. Stanton on September 27, 2010, she expressed her concerns that she felt the Lady Vols staff and female student-athletes were not always receiving equal treatment with their male counterparts. During her September 27, 2010, meeting with Mr. Stanton, it became clear to Plaintiff by Mr. Stanton's body language, demeanor and disinterest that Mr. Stanton didn't like what she was saying and the scheduled meeting ended.

116.    Thereafter, as the media relations consolidation continued under Stanton and Fuller, Plaintiff was gradually stripped of her duties and responsibilities as a director, including budget oversight, hiring and evaluating employees, decision-making input at staff meetings, and Plaintiff's direct reports were removed and reassigned. In most instances, the duties, responsibilities and employees were assigned to younger, less qualified male employees, including Jimmy Stanton (age 38), and eventually, Jason Yellin (age 38).

117.    As the media relations consolidation continued, Plaintiff was further marginalized and began to be excluded from meetings and from the decision-making process despite the fact that Plaintiff was an Associate Athletic Director and had previously been actively involved in the decision-making process in Women's Athletics for over 30 years.

118.    During this time, Plaintiff also discovered that she was still being paid less than a similarly situated male, Bud Ford, who had the exact same title as her.

119.    According to UT-K Chancellor Dr. Jimmy Cheek's memo of June 23, 2011, employees where "two or more employees in a department have the same job title, similar education, experience and performance should not have a noticeable difference in salary." (Memo attached, as Exh. 3).

26

120.     Bud Ford's job title in 2011 was Associate Athletic Director and Plaintiff's job title in 2011 was Associate Athletic Director, and they both reported to the same supervisor.

121.     Bud Ford was paid approximately $4,000.00 more per year than the Plaintiff in 2009, 2010, and 2011 following media relations consolidation.

122.     Plaintiff requested on more than one occasion for the inequity in pay between her and her male counterpart be addressed and rectified, but it was never corrected up to the date Plaintiff was forced to retire.

123.     On information and belief, Chris Fuller and Jimmy Stanton were aware that Plaintiff had requested to be paid the same as Bud Ford, but they decided not to correct the pay discrepancy.

124.     On February 25, 2011, during her annual performance review, the Plaintiff tried to discuss with her new supervisor, Jimmy Stanton, some of the inequities she had observed and some of the discriminatory actions she had experienced since the inception of the media relations consolidation process.

125.     When Plaintiff mentioned these matters to Mr. Stanton on February 25, 2011, Mr. Stanton appeared irritated and he did not deny the facts and circumstances the Plaintiff raised with him.

126.     During the performance review on February 25, 2011, the Plaintiff told Mr. Stanton that she felt the consolidated athletic department was becoming "a good 'ol boys club" and she was feeling discriminated against and marginalized because she was a 56-year old female.

127.     During the performance review on February 25, 2011, the Plaintiff also told Mr. Stanton that she had previously discussed her concerns of discrimination with Coach Pat Summitt.

128.     Mr. Stanton appeared particularly angry when Plaintiff told him she had shared her concerns of discrimination with Lady Vols Basketball Coach Pat Summitt.

129.     Plaintiff had hoped that expressing her concerns in an honest and straightforward manner to her supervisor would prompt change but Mr. Stanton and Mr. Stanton's supervisor, Chris Fuller, apparently did not perceive any issues, except for the fact the Plaintiff had complained, and they were angry she had complained.

130.     After Plaintiff's February 25, 2011, meeting with Mr. Stanton, the retaliation escalated and Plaintiff was treated in an increasingly hostile and demeaning manner and actions were thereafter taken against her that were calculated to further isolate her and to convince her to quit.

131.     After the Plaintiff's February 25, 2011, meeting with Mr. Stanton, instead of trying to address or even understand Plaintiff's complaints and concerns, Jimmy Stanton and his supervisor, Chris Fuller, began trying to "document" Plaintiff's file and began communicating behind her back with the Defendants' H.R. Department and with the Defendant's "Diversity Department."

132.     The Plaintiff did not bother complaining to the Defendant's "Diversity Department" because of its reputation for being biased against UT-K employees, but instead continued trying to resolve her complaints and concerns from inside the system.

133.     When the Plaintiff would see Mr. Stanton and Mr. Fuller after her February 25, 2011, meeting with Mr. Stanton, they appeared angry at her, or otherwise ignored her, gave her the cold shoulder, and they also began trying to undermine her relationships with other employees in the Athletic Department, and the discriminatory/retaliatory atmosphere continued and intensified.

134.     In the Winter of 2010 - 2011, the Plaintiff learned that UT-K was going to hire a person to run the Media Relations office and Plaintiff went to Jimmy Stanton and asked him if she could be considered to run the Media Relations office.

135.     At the time Plaintiff approached Mr. Stanton, Mr. Stanton was aware that Plaintiff had successfully run the Women's Athletic Department's Media Relations Office for the past 33 years.

28

136.    Despite having over thirty (30) years of award winning experience, a good working relationship with the media on the local, state and national levels, and a 100% job placement of her graduate assistants, Jimmy Stanton told Plaintiff "no," she would not be considered for the position.

137.    Mr. Stanton told her she would not be considered to run the media relations office because he didn't have the confidence that she could do the job because she was "opinionated about the staff." This excuse was a pretext, and it was Mr. Stanton who was opinionated. The real reason Mr. Stanton wouldn't consider Plaintiff for the position was because she had opposed discriminatory actions and Mr. Stanton wanted a younger male for the position, and so he refused to even consider Plaintiff for the position and he hired Jason Yellin.

138.    On May 23, 2011, Jason Yellin (then age 37), was hired as the Assistant Athletic Director for Media Relations, and he began to report to Jimmy Stanton.

139.    Mr. Stanton made the decision to hire Jason Yellin for the position of Assistant Athletic Director for Media Relations.

140.    The Plaintiff was qualified for the position of Assistant Athletic Director for Media Relations.

141.    The Plaintiff was more qualified for the position than Mr. Yellin.

142.    After Dave Hart was hired by UT-K, the Plaintiff met with the new UT-K Athletic Director for her first sit down meeting on September 22, 2011.

143.    During Plaintiff's meeting with Dave Hart, Plaintiff gave him her honest assessment of what had been occurring during the consolidation process, and she told him that she thought the Athletic Department was becoming a "good 'ol boys' club." Plaintiff discussed with Mr. Hart the increasing inequities, and she told him she was being demeaned, diminished, marginalized, discriminated against and retaliated against. Heading into the meeting, the Plaintiff's hope was that Mr. Hart would have an

open mind about these issues, but as the meeting progressed, it was clear he did not. During her meeting with Mr. Hart, he made it clear he had his own meeting agenda and did not want to hear what she had to say, nor did he act concerned, or even ask questions regarding the issues Plaintiff had attempted to address.

144.    During Plaintiff's meeting with Mr. Hart, Plaintiff and Mr. Hart also discussed Coach Pat Summitt's condition of early onset dementia. Mr. Hart told Plaintiff about a situation he was aware of where an elderly person had debilitating symptoms of Alzheimer's.

145.    Mr. Hart's comments about the elderly person he knew were unsettling to Plaintiff because of Mr. Hart's preconceived conclusion that someone with this diagnosis would no longer be fit to coach, when Coach Summitt only had early onset, and she was functioning at a high level and Plaintiff told him this.

146.    After Plaintiff's meeting with Dave Hart, Plaintiff had very little further contact with Mr. Hart, and she was told by Jason Yellin, the new Assistant Athletic Director for Media Relations, on October 11, 2011, that Plaintiff did not need to attend any further external athletic department staff meetings further marginalizing her. When Mr. Yellin gave the Plaintiff these instructions, he was following the instructions of his supervisor, Jimmy Stanton and/or Dave Hart.

147.    In December 2011, on information and belief, UT-K's highly successful female soccer coach, Angela Kelly, went to Mr. Hart because she had been offered a job at the University of Texas but she really wanted to stay at UT-K. On more than one occasion, Coach Angela Kelly had remarked to Plaintiff that she would love to coach at one school for her entire career the way Pat Summitt, a woman Kelly considered as one of her mentors, had been able to do.

148.    Coach Angela Kelly was highly successful while at UT-K.

149.    On information and belief, instead of trying to keep Coach Angela Kelly, Dave Hart basically said "Good Luck," and did not try to get her to stay. After Coach Angela Kelly resigned, Mr. Hart replaced Coach Angela Kelly, and the female coaches on her staff with an all-male coaching staff.

150.    Mr. Hart made the decision to accept Coach Angela Kelly's resignation.

151.    Mr. Hart made the decision to replace Coach Angela Kelly with a male coach.

152.    On December 7, 2011, Mr. Hart told the Plaintiff she "was not in his future plans," and he wanted to announce her retirement by the end of December 2011.

153.    Mr. Hart made the decision to ask Plaintiff to announce her retirement the end of December 2011.

154.    In the meeting with Mr. Hart on December 7, 2011, Mr. Hart did not accuse Plaintiff of being insubordinate or raise any issues or concerns at all related to her job performance.

155.    On December 7, 2011, Mr. Hart also met with another older employee, Bud Ford, and told him that he had to retire at the end of December 2011, and if he did not, he would be fired.

156.    On December 7, 2011, Mr. Hart also told Bud Ford, that UT-K would not honor Ford's letter agreement to be the Athletic Department Historian starting January 1, 2012.

157.    Mr. Hart made the decision to ask Mr. Ford to retire by the end of December 2011.

158.    On December 14, 2011, in a 7:49 a.m. phone call to Plaintiff, Mr. Hart pressured Plaintiff for a "decision" on her retirement announcement but Plaintiff had been traveling on the road with the Lady Vols basketball team and did not have the opportunity to explore the consequences of her decision with UT-K's Human Resources Department.

159.    Plaintiff subsequently declined Mr. Hart's request that she retire by the end of December 2011 in an email. (A copy of this email is attached as Exh. 3).

31

160.     When Plaintiff declined Mr. Hart's invitation to retire, she protested his request in writing as discriminatory and retaliatory.  (See Exh. 3).

161.     Plaintiff did not want to retire, because she needed her job and she loved UT-K and did not want to abandon Coach Summitt when she needed her most.

162.     In March of 2012, Coach Pat Summitt had a meeting with Dave Hart the day before her team traveled to Chicago, Ill., for the NCAA tournament.

163.     During Mr. Hart's meeting with Coach Summitt in March of 2012, Mr. Hart told Coach Summitt that she would not be coaching the Lady Vol basketball team the next school year (2012-13), and he planned to name Holly Warlick as the head coach.

164.     Mr. Hart made the decision that Coach Summitt would not be coaching the Lady Vol Basketball team during the 2012-2013 school year.

165.     Mr. Hart made the decision to name Holly Warlick as head coach of the Lady Vol Basketball team to replace Coach Summitt.

166.     After her meeting with Mr. Hart, Coach Summitt told Plaintiff about her conversation with Mr. Hart where he told her she would not be head coach of the Lady Vol Basketball team during the 2012-2013 school year.   When Coach Summitt told Plaintiff of Mr. Hart's conversation, Coach Summitt was very upset and extremely hurt.

167.     Shortly after her meeting with Mr. Hart, Coach Summitt also told others about Mr. Hart's decision, including her secretary, personal administrative assistant and a Lady Vol assistant basketball coach.

168.     Plaintiff regarded Mr. Hart's decision as wrong and discriminatory towards Coach Pat Summitt and admittedly, Plaintiff protested it in writing on March 15, 2012, and she requested that Mr. Hart reconsider his decision.  Mr. Hart sent Plaintiff a very angry email in response, and when Mr. Hart

32

traveled to Chicago, Illinois for the Lady Vols game against DePaul on March 19, 2012, he reacted visibly hostile toward the Plaintiff. (A copy of this email exchange is attached hereto as Exhibit 4).

169. At the time Plaintiff sent the March 15, 2012, email to Mr. Hart, she had a good faith belief that Mr. Hart had told Coach Summitt she would not be head coach for the next school year (2012-2013).

170. Coach Summitt thereafter stepped down after signing an agreement with UT-K where she would be Head Coach Emeritus for a year through April 30, 2013 and Holly Warwick replaced her.

171. EEOC's regulations define impairment in pertinent part as:

> "(1)  Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine;" 29 C.F.R. §§ 1630.2

172. Early onset dementia constitutes an impairment as defined by 29 C.F.R. §§ 1630.2.

173. Early onset dementia is an impairment within the meaning of 42 U.S.C. §§ 12101(2).

174. Early onset dementia constitutes a disability within the meaning of 42 U.S.C. §§ 12101, et. seq.

175. In March 2012, Coach Pat Summitt was disabled within the meaning of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et. seq.

176. In March 2012, Coach Pat Summitt was regarded by Defendants as having an impairment.

177. In March 2012, Dave Hart regarded Coach Summitt as having a disability.

178. Plaintiff's opposition to Dave Hart's discriminatory treatment of Coach Summitt was a factor in Mr. Hart's decision to give the Plaintiff the "choice of resigning, retiring, or being fired" on May 15, 2012.

33

179.  In March 2012, all UT-K Athletic Media Relations employees (with the exception of the Plaintiff), even John Painter and Susie Treis, who were part of the April 13th layoffs, had their 2011 performance reviews. Per UT-K Chancellor Jimmy Cheek, these evaluations were to be completed by March 30, 2012. Even though the Plaintiff prepared her goals and objectives for the upcoming year in anticipation of her annual performance review, her performance review for 2011 was never begun or completed by her supervisor Jimmy Stanton.

180.  Prior to her termination, the Plaintiff expressed her ongoing concerns about the <u>disparate impact</u> of Mr. Hart's April 13, 2012 lay-offs on the female employees.

## VIII. DEBBY JENNINGS' FORCED RETIREMENT, CONFISCATION OF HER COMPUTER, AND HER FEW REMAINING DUTIES GIVEN TO A YOUNGER MALE

181.  On May 15, 2012, Plaintiff had a meeting with Dave Hart at 1:00 p.m. in his office. When Dave Hart started the meeting with the Plaintiff, he referred to it as a "pre-termination meeting <u>or</u> it could be a termination meeting."

182.  At Plaintiff's May 15, 2012, meeting with Dave Hart, Dave Hart gave the Plaintiff the "choice" of resigning, retiring, or being fired and told her: "You have until 4:30 this afternoon to give me your answer."

183.  It was during the meeting of May 15, 2012, the Plaintiff heard for <u>the first time</u> from Dave Hart (or anyone else) that he felt the Plaintiff had allegedly been "insubordinate."

184.  Dave Hart made the decision to give the Plaintiff the choice of retiring, resigning or being fired on May 15, 2012.

185.  By May 15, 2012, Dave Hart was aware that the Plaintiff had made complaints that she had been discriminated and retaliated against, and that she had raised equity issues involving female student-athletes.

34

186. By May 15, 2012, Mr. Hart was aware that Plaintiff protested his decision that Coach Summitt would not be Head Coach for the next school year (2012-2013).

187. During the May 15, 2012, meeting, Dave Hart told the Plaintiff that he had to have the Plaintiff's decision by 4:30 p.m. that day, before he left on the Big Orange Caravan, or the Plaintiff would be "presented with a letter of termination effective immediately."

188. Plaintiff's May 15, 2012 "meeting" with Dave Hart lasted just a few minutes.

189. When Plaintiff returned to her office following the May 15, 2012, meeting with Dave Hart, Plaintiff's computer had been confiscated and removed from her office by Athletic IT Director Thomas Moats.

190. When Plaintiff protested the confiscation of her computer because she had a deadline to send requested photos of former Lady Vol, Tamika Catchings, to *Sports Illustrated*, Moats returned to her office with her computer after approval from Jon Gilbert. Under Moats' supervision, Plaintiff sent those photos to Sports Illustrated. When she was using her computer, Plaintiff then noticed that folders containing email correspondence between herself and Mr. Fuller, Mr. Stanton and Mr. Yellin had been deleted or removed from her Outlook email directory.

191. Shortly after Plaintiff's computer was confiscated on May 15, 2012, agents and employees of Defendants deleted or removed folders containing email correspondence between herself and Chris Fuller, Jimmy Stanton and Jason Yellin.

192. Dave Hart left Plaintiff with less than three (3) hours to make her decision and then to pack-up the contents of her office of 35 years. Consequently, the Plaintiff was forced to cancel a follow-up visit with her internal medicine doctor that afternoon while she researched the consequences of Dave Hart's "choices" with UT-K's Human Relations Department and to pack-up her office that day. As a cancer survivor, Plaintiff did not normally miss scheduled medical appointments.

193. After learning from HR that Plaintiff would lose 452.7 days (or 3620.20 hours) of unused sick leave toward her total creditable service (which would have affected her monthly retirement paycheck) if Plaintiff was fired or resigned, Plaintiff felt she had no choice but to retire.

194. Jon Gilbert, one of the athletic department employees Dave Hart hired from the University of Alabama, accepted Plaintiff's decision to retire.

195. After Plaintiff's forced retirement at age 57, her few remaining duties were taken over by a younger male, Eric Trainer (age 48).

196. Jimmy Stanton, Jon Gilbert and Dave Hart made the decision to have Eric Trainer take over Plaintiff's remaining job duties following her termination.

197. At the time of Plaintiff's termination on May 15, 2012, she was an Associate Athletics Director in Media Relations for the Athletic Department and reported to Jimmy Stanton, Associate Athletic Director for Communications.

198. After Plaintiff's forced retirement, Plaintiff's supervisor, Mr. Stanton released a statement to the media that Plaintiff had "announced her retirement." Mr. Stanton quoted Mr. Hart as follows: "We would like to thank Debby for her service to the University of Tennessee," said Vice Chancellor and Director of Athletics Dave Hart. "She has been a part of our eight national championships in women's basketball, and we wish her well." (See Exh. 5)

## IX. POST TERMINATION RETALIATION AND REQUEST FOR UT-K TO PRESERVE EVIDENCE

199. Following Plaintiff's termination, her attorney sent two letters to Dave Hart dated May 18, 2012, one protesting her wrongful termination as discriminatory and retaliatory, and the second requesting that certain documents and emails be preserved pending the final outcome of any and all litigation. (A copy of the nonspoliation letter is attached as Exh. 6).

200.     Following Mr. Hart's receipt of these two letters a series of retaliatory actions took place, including:

a.)     A series of selected emails and documents were released by the Athletic Department to the media, including a libelous memo allegedly from Dave Hart dated "April ____, 2012" advising Plaintiff she was being "terminated immediately for unsatisfactory work performance... I have come to the conclusion that you are insubordinate, disrespectful to management and foster an atmosphere of negativity and division."   (See Exh. 7).  Plaintiff never saw Exhibit 8 before Mr. Hart released it to the media.  Plaintiff had not been "insubordinate" or "disrespectful" or "negative" unless Mr. Hart was referring to her opposition to discriminatory treatment to which she had been subjected or her opposition to his discriminatory treatment of Coach Summitt, or that of other female or older employees;  (See Exh. 4).

b.)     After her forced retirement on May 15, 2012, Plaintiff had been accessing her UT-K email account that all eligible retirees, such as the Plaintiff, are allowed to access, but on or about May 23, 2012, she was locked out of her UT-K email account, and thereby unable to access her emails once news of her forced retirement hit the media, and her concerned friends and colleagues were trying to reach her.

c.)     Plaintiff's professional mail through the United States Postal Office, Federal Express and UPS that was addressed to her and sent to her former office on and after May 15, 2012, was "lost" or "destroyed" and not given to her;

d.)     Shortly after her forced retirement on May 15, 2012, the media relations staff Plaintiff had worked with was told by Jimmy Stanton and Jason Yellin not to talk to the Plaintiff following her "retirement" or "their loyalty to U.T. would be questioned."

37

These actions, as set forth above, constitute further illegal acts of retaliation against the Plaintiff for engaging in protected activities.

201. These acts of retaliation are extremely hurtful, and the retaliatory action increased the emotional distress caused by her wrongful termination.

## X. MR. HART'S BACKGROUND AND PRIOR ACTS OF DISCRIMINATION

202. During Plaintiff's investigation leading to the filing of this suit, Plaintiff learned, among other matters, that Dave Hart, earlier in his career when he was an athletics administrator at East Carolina University, had organized Miller Lite tailgate parties that featured coed "Bikini Contests". (See Exh. 8).

203. During Plaintiff's investigation leading to the filing of this Complaint, Plaintiff also learned, among other matters, that Dave Hart had discriminated against other females and female athletes while he was the Athletic Director at Florida State University (including softball coach, Jo Anne Graf and women's basketball coach Christiane Gobrecht), and while he worked at the University of Alabama as the Executive Director of Athletics (cheerleading coach, Debbie Greenwell), and that Title IX actions were filed against both universities. (See attached Exhs.10, 11 and 12).

204. Plaintiff believes the actions set forth herein reflect a continuing pattern of discriminatory and retaliatory conduct Dave Hart was involved in previously, and it has continued at UT-K.

## XI. ILLEGAL DISCRIMINATION AND RETALIATION: STATUTORY VIOLATIONS AND DAMAGES

205. Plaintiff has been discriminated against due to her age and sex, and retaliated against because she opposed discrimination against herself, and that was occurring to others, including disability discrimination against Coach Pat Summitt, and because Plaintiff advocated in favor of Title IX, gender equity, or for female student athletes, or opposed discrimination against female student athletes at UT-K.

206. The real reason for Plaintiff's termination was because certain members of the Athletic Department, including Dave Hart, Chris Fuller and Jimmy Stanton, wanted to model UT-K's Athletic Department as a good 'ol boys club and they wanted to replace her with a younger man and/or they were retaliating against her for engaging in oppositional activity as described herein.

207. As a result of the sex discrimination and retaliatory actions as set forth herein, the Plaintiff filed a timely Charge of discrimination and retaliation (Title VII and the ADA) with the EEOC. The EEOC Charge did not include an age discrimination claim pursuant to the ADEA because the U.S. Supreme Court has ruled States are immune from suits based on the ADEA claims, so Plaintiff's age based claims of discrimination and retaliation are brought solely pursuant to the THRA.

208. Plaintiff has not yet received a right to sue notice for her Title VII (discrimination and retaliation), and ADA (ADA retaliation) claims, but she intends to amend this complaint to assert same upon receipt.

209. After receipt of the right to sue notice from the EEOC, Plaintiff will have satisfied all of the procedural and administrative requirements of § 706 of the Title VII and the ADA.

210. This suit is timely filed.

211. The Defendant, by and through its agents and employees, discriminated against Plaintiff due to her sex and age, and/or retaliated against the Plaintiff for opposing sex, and/or disability, age discrimination, or retaliated against the Plaintiff for advocating gender equity issues, and/or opposing discrimination against student female athletes.

212. Dave Hart is being sued because he retaliated against the Plaintiff as a result of her oppositional activities, Tenn. Code Ann. §§ 4-21-301(1), and pursuant to Tenn. Code Ann. § 4-21-301(2), because he was an individual who aided, abetted, intended compelled or commanded UT-K in engaging in the discriminatory and retaliatory conduct herein alleged. At all times stated herein,

39

Defendant Hart knew that the discriminatory practices and retaliatory actions set forth herein constituted violations of the law and his actions prevented the employer from taking corrective action, and he directly retaliated against the Plaintiff when he forced her to retire.

213.    The Defendant is responsible for the retaliatory and or discriminatory actions of its agents and employees under the doctrine of <u>respondent superior</u> and under agency principles.

214.    Plaintiff maintains that Defendants' conduct constitutes discrimination against Plaintiff affecting a term, condition or privilege of employment because of her sex and/or constitutes unlawful retaliation for engaging in oppositional activities in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981 (a), ADA 42 U.S.C. § 12101, *et. seq.*, and Title IX §§ 20 U.S.C. § 1681(a), and the Tennessee Human Rights Act, Tenn. Code Anno. §§ 4-21-101, *et. seq*, and also constitutes age discrimination and/or retaliation for opposing age discrimination under the Tennessee Human Rights Act, §§ 4-21-101, *et. seq.*

215.    As a result of Defendant's conduct, the Plaintiff has lost tangible job benefits, including loss of income and benefits, both past and future, and she has suffered and will continue to suffer, irreparable injury, emotional distress, humiliation and embarrassment, and other pecuniary losses as a direct result of Defendants' illegal actions.

216.    The conduct of Defendants is willful.

## XII:  PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff prays for the following relief:

1.    Compensatory damages, including front pay;

2.    Liquidated damages;

3.    Prejudgment interest;

4.    Reasonable attorney's fees and expert witness fees;

5.     Costs of this action;

6.     A jury to try this cause; and,

7.     A mandatory injunction ordering the Defendant to refrain from unlawful discrimination and/or retaliation, and ordering Defendant to undertake and rectify any and all Title IX violations or inequities, and for Mr. Hart, Mr. Fuller and Mr. Stanton to undergo appropriate diversity, and Title IX and ethics training, and all other general relief this Honorable Court deems appropriate.


RESPECTFULLY SUBMITTED this the 27th day of September, 2012.



                              BURKHALTER, RAYSON & ASSOCIATES, P.C.


                              s/David Burkhalter
                              David A. Burkhalter, II, BPR 3004771
                              Ronald A. Rayson, BPR #013393
                              Attorneys for Plaintiff
                              P.O. Box 2777
                              111 S. Central Ave.
                              Knoxville, TN  37902
                              (865) 524-4974
                              (865) 524-0172 - Fax


41